OPINION
{¶ 1} Defendant-appellant David G. Thorne appeals from the October 15, 2003, Judgment Entry of the Stark County Court of Common Pleas, which denied appellant's petition for post-conviction relief. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On September 15, 1999, the Stark County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01. The grand jury added a complicity for hire specification, pursuant to R.C. 2929.04(A)(2). The indictment arose from the allegation that appellant hired Joseph Wilkes to kill appellant's ex-girlfriend, Yvonne Layne. Ms. Layne was the mother of five children. Appellant was the father of one of Ms. Layne's children, Brandon. After a police investigation which led to Mr. Wilkes, Mr. Wilkes agreed to testify truthfully about the crime and appellant's involvement in the planning of the murder in exchange for a life sentence with possibility of parole after 30 years.
 {¶ 3} A jury trial commenced on January 18, 2000, at which time the following evidence was adduced. On April 1, 1999, Tawnia Layne, the victim's mother, went to Yvonne Layne's home to take one of her grandchildren to school. When she arrived, Tawnia found her daughter's body. Yvonne's throat had been cut, and her body was lying in a pool of blood. Yvonne's five young children were awake in the house but were locked in their rooms. Tawnia Layne called the police.
 {¶ 4} While there were two partial bloody footprints at the scene, there was little other physical evidence. The police were unable to recover any usable fingerprints.
 {¶ 5} As part of the investigation, the police discovered that Ms. Layne had recently implemented paternity proceedings for her son, Brandon. As a result, appellant had been ordered to pay child support in the amount of $358 per month, with weekly payroll deductions beginning in March, 1999. By the time of his first payment, appellant owed more than $700 in back support.
 {¶ 6} The Alliance police learned of Joseph Wilkes through Rose Mohr. Ms. Mohr contacted the police to tell them that she and her boyfriend, Chris Campbell, had spoken with Mr. Wilkes at the Carnation Mall in Alliance on the night of March 31, 1999, the night of the murder. According to Ms. Mohr, Mr. Wilkes told her and Mr. Campbell that he was in Alliance because he had been hired to kill a woman. Mr. Wilkes made statements that he had purchased a knife at K Mart and showed the knife to Ms. Mohr and Mr. Campbell. Ms. Mohr remembered Mr. Wilkes saying that he was hired for money to commit the murder "for a guy." In contrast, Mr. Campbell recalled Mr. Wilkes stating that his "girlfriend" had paid for a room for him at the adjoining Comfort Inn and that the girlfriend had asked Mr. Wilkes to commit the murder. Ms. Mohr claimed that at this meeting, Mr. Wilkes wrote his name and phone number on a business card and gave it to her.
 {¶ 7} In July, 1999, Mr. Wilkes confessed to the murder and implicated appellant, claiming that appellant paid him to kill Ms. Layne. Mr. Wilkes claimed that appellant wanted custody of his son, Brandon, and did not want to pay child support to Ms. Layne. Mr. Wilkes gave details on how appellant 1) planned the murder, 2) provided an alibi for himself, 3) provided Mr. Wilkes with a place to stay before and after the murder, 4) provided transportation to and from that location, and 5) provided money to purchase batting gloves and the knife used in the murder.
 {¶ 8} Specifically, Mr. Wilkes testified at trial that he rented a room at the Comfort Inn at Carnation Mall in Alliance on March 31, 1999. He then purchased batting gloves and, later, a knife at the K Mart in the mall, walked to Ms. Layne's residence, and committed the murder. He told the police he threw the knife in a storm sewer near the house, and disposed of his gloves in a McDonald's dumpster. Mr. Wilkes claimed that the next morning appellant picked him up at the motel and took him to a friend's house. Mr. Wilkes hid his nylon pants, which he claimed he had worn at the time of the murder, in the woods near his friend's house.
 {¶ 9} Mr. Wilkes' took the police to a storm sewer where they recovered a knife and to where a pair of pants were found under some brush. The knife was consistent with the knife sold at K Mart, the knife shown to Mohr and Campbell and the murder weapon. The pants matched a description of the pants Mr. Wilkes was wearing at Carnation Mall the night of the murder.
 {¶ 10} The knife and pants were tested for human blood. A preliminary test on the knife showed the possibility that there was human blood on the knife. However, further testing failed to return a positive result of human blood. No blood was found on the pants.
 {¶ 11} However, the condition of the knife and pants was consistent with them having been subject to the elements for several months. According to testimony, this could have accounted for the failure to find blood on either item.
 {¶ 12} In addition, there was testimony concerning the shoes worn by Mr. Wilkes on the night of the murder. Mr. Wilkes testified that he was wearing Nike shoes. A Detective from the Alliance Police Department testified at trial that as a result of the investigation, the Detective had a clerk at Dick's Sporting Goods identify the tread pattern of the shoe prints found in the blood. According to the Detective, the clerk provided the Detective with a shoe that "pretty much" matched the tread pattern. That shoe was a Nike. Tr. 1417-1418.
 {¶ 13} After five days of testimony and deliberation, the jury found appellant guilty of aggravated murder as well as the complicity for hire specification. On January 27, 2000, a sentencing hearing was held. After hearing the testimony, the jury was unable to reach a verdict as to whether appellant should receive the death penalty. Accordingly, the trial court declared a mistrial as to the penalty phase of the trial and proceeded to sentence appellant to a term of life in prison without parole eligibility, pursuant to State v. Springer (1992),63 Ohio St.3d 167, 586 N.E.2d 96.
 {¶ 14} Appellant appealed his conviction and sentence to this Court. Appellant's conviction and sentence was affirmed.[1]
Appellant appealed this Decision to the Ohio Supreme Court. The Ohio Supreme Court declined to accept the case for further review.
 {¶ 15} On November 13, 2000, appellant filed a Petition for Post-Conviction Relief, pursuant to R.C. 2953.21. In addition, appellant filed two amendments to this petition and supplemented the petition with evidentiary materials, including an affidavit of Joseph Wilkes. In the affidavit, Mr. Wilkes denied killing Ms. Layne or being hired by appellant. The trial court conducted an evidentiary hearing on May 12, 2003.
 {¶ 16} At the evidentiary hearing, Mr. Wilkes testified that he had not been hired by appellant and had not killed Ms. Layne. In addition, appellant presented the testimony of a crime scene expert who claimed that the murder of Ms. Layne could not have happened the way Mr. Wilkes described. Appellant also presented the testimony of a questioned documents examiner who stated that when he compared the writing on the business card provided by Ms. Mohr to an alleged sample of Mr. Wilkes' handwriting, he concluded that they had not been written by the same person. In addition, a woman testified that Mr. Wilkes told her, before appellant's trial, that he was going to lie at trial and take the plea to save himself.
 {¶ 17} One additional witness was presented by appellant. That witness was George Hale. Appellant claimed that Mr. Hale was a newly discovered witness. Because, Mr. Hale's existence was never released to appellant at the time of appellant's trial, appellant alleged that he had been the victim of a Brady
violation.[2] At the evidentiary hearing, Mr. Hale testified that on the morning of April 1, 1999, he walked by Ms. Layne's home and observed a person exit the house carrying a trash bag and walk around toward the back of the house.[3]
Mr. Hale also testified that later in the day, he gave a statement to the police, which was documented in a supplemental report written by a detective of the Alliance Police Department.[4] On cross examination, Mr. Hale also agreed with the prosecuting attorney when the prosecuting attorney asked "you don't know for sure that he was in that house, do you?" Tr. of PCR hearing, pg. 37. Mr. Hale verified that neither Mr. Wilkes nor appellant was the man he saw exiting the residence.
 {¶ 18} On October 15, 2003, the trial court issued a Judgment Entry which denied appellant's Petition for Post-Conviction Relief. The trial court found that many of appellant's arguments were barred as res judicata. In addition, the trial court questioned Mr. Wilkes' motives and reliability. In essence, the trial court found Mr. Wilkes was not credible. The trial court also concluded that the evidence submitted and produced at trial strongly corroborated the details of Mr. Wilkes' initial confession.
 {¶ 19} Thus, it is from the October 15, 2003, Judgment Entry that appellant appeals, raising the following assignments of error:
 {¶ 20} "I. The trial court erred in failing to grant post-conviction relief to appellant based upon the state's failure to disclose exculpatory evidence.
 {¶ 21} "II. The trial court erred in failing to grant post-conviction relief [sic] to the recantation of the former testimony of the state's primary witness.
 {¶ 22} "III. The trial court erred in failing to grant post-conviction relief based on inadequate representation of counsel.
 {¶ 23} "IV. The trial court erred in failing to granted [sic] post-conviction relief to appellant based upon prosecutorial misconduct."
 I {¶ 24} In the first assignment of error, appellant contends that the trial court erred when it failed to grant appellant a new trial based upon the State's failure to disclose George Hale as a witness, in violation of Brady v. Maryland (1963),373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. We disagree.
 {¶ 25} In Brady v. Maryland, supra, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87; See State v. Treesh
(2001), 90 Ohio St.3d 460, 475, 739 N.E.2d 749, 767. "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v. Johnston (1988), 39 Ohio St.3d 48,529 N.E.2d 898, paragraph five of the syllabus (following UnitedStates v. Bagley (1985), 473 U.S. 667, 105 S.Ct. 3375, 87L.Ed.2d 481).
 {¶ 26} We find no showing of a Brady violation. We cannot conclude that there is a reasonable probability that, had Mr. Hale been disclosed to the defense, the result of the trial would have been different. In this case, the jury was presented with a complete confession by Mr. Wilkes, which implicated appellant as the man who paid Wilkes to commit the murder. In addition, Mr. Wilkes not only told the police and subsequently the jury, the details of his offense but Mr. Wilkes took police to where they could recover a knife which was consistent with the knife used to kill the victim. The knife was identical to a knife purchased at the K Mart at Carnation Mall on March 31, 1999, at 8:10 P.M. Around that same time, Mr. Wilkes was seen at the Carnation Mall by Ms. Mohr and Mr. Campbell. Mr. Wilkes proceeded to show these two people a knife, which was consistent with the knife sold at K Mart and consistent with the knife recovered through Mr. Wilkes. The knife had a substance on it that gave a preliminary positive test result for blood although the substance could not be further identified as human blood. According to Mr. Campbell, Mr. Wilkes stated that he was in Alliance to handle some business. When asked what business, Mr. Wilkes showed them the knife. Tr. of Trial, Vol. VI, pg. 1487. According to Rose Mohr, Mr. Wilkes showed them the knife and said "that he was there to kill some girl in Alliance, that some guy had paid him." Tr. of Trial, Vol. IV, pg. 1113.
 {¶ 27} Mr. Wilkes was wearing a nylon workout suit at the Mall. After confessing, Mr. Wilkes told the police where to find the pants he wore that night. Nylon pants like the ones he claimed he wore and as seen by Ms. Rohr and Mr. Campbell were found where Mr. Wilkes said, specifically, under some brush in Ravenna. Although no blood was found on the pants, Jennifer Bloink, a criminalist at the Canton-Stark County Crime Laboratory, testified that the pants were covered in mud, debris and mold which would hamper the ability to detect blood . She also testified that the pants showed the effects of being in the elements for quite a while which would also hamper the ability to identify small blood stains and may have washed away any blood. Tr. of Trial, Vol. IV, pg. 951-952.
 {¶ 28} This strong evidence must be considered against what George Hale could have disclosed. Mr. Hale originally claimed that between 9:30 and 10:00 A.M. on April 1, 1999, he saw a man, not appellant or Mr. Wilkes, exit the victim's residence with a trash bag. There is a significant gap between the time Mr. Hale saw this unknown man and the estimated time of the victim's death. The Stark County Chief Deputy Coroner, Dr. P.S.S. Murthy, stated that the time of death was around or after 7:00 or 8:00 P.M. on March 31, 1999. Further, upon cross examination at the evidentiary hearing, Mr. Hale stated that he could not know for sure that the man he saw was in the victim's house nor did he know what was in the garbage bag. On cross-examination, Mr. Hale agreed that all he could recall was that "there was a guy around that house carrying some sort of garbage bag. . . ." Tr. of PCR hearing, pg. 40.
 {¶ 29} Upon review, we find that Mr. Hale's testimony would not have been material, as defined in Johnson, supra., andBagley, supra. We find no reasonable probability that, had this evidence been disclosed to the defense, the result of the trial would have been different.
 {¶ 30} Accordingly, while this court believes the best course of action would have been for the police to reveal the existence of Mr. Hale to the defense, we find that there was no Brady
violation. Appellant's first assignment of error is overruled.
 II {¶ 31} In the second assignment of error, appellant argues that the trial court should have granted appellant a new trial based upon the recantation of the State's primary witness, Joseph Wilkes. Essentially, appellant argues that if one cannot trust Mr. Wilkes' confession concerning the murder itself, one cannot trust Mr. Wilkes' accusations against appellant.
 {¶ 32} At the evidentiary hearing, Mr. Wilkes stated that his prior statements against appellant were false and that neither he nor appellant had anything to do with the victim's death. Mr. Wilkes claimed that any information he possessed regarding the murder was given to him by the Alliance Police. Mr. Wilkes asserted that he implicated appellant because he was afraid and felt that he had no choice.
 {¶ 33} Appellant argues that Mr. Wilkes' recantation is supported by the testimony of Brent Turvey, a private crime scene investigator, and Michael Robertson, a questioned documents examiner. Mr. Turvey testified that upon his review of the forensic documentation available, including photographs of the crime scene, the crime could not have occurred as described by Mr. Wilkes. Mr. Wilkes claimed that the victim was first attacked while on the couch and then moved to a sliding glass door, before she collapsed. Mr. Turvey claimed that the photographs showed that the victim was attacked while she stood at the sliding glass doors and then was partially dragged to where she was found. Mr. Turvey claimed that any blood found on the couch was transferred to the couch by the attacker.
 {¶ 34} Michael Robertson testified as a questioned documents examiner. Mr. Robertson compared the writing on the business card on which Mr. Wilkes allegedly wrote his name and phone number when he spoke with Rose Mohr and Chris Campbell at the Carnation Mall. Ms. Mohr claimed that appellant wrote on the card at the same general time he told her and Mr. Campbell that he had been hired by someone to kill a girl. Mr. Robertson compared the card to a sample given to him which was claimed to be a sample of Mr. Wilkes' handwriting. Mr. Robertson concluded that the handwriting on the card was not written by the same person that wrote the sample. From that conclusion, appellant argues that Ms. Mohr provided perjured testimony in regard to the business card and thus the rest of her testimony is tainted.
 {¶ 35} Recantations of prior testimony are to be examined with utmost suspicion. State v. Germany (Sept. 30, 1993), Cuyahoga App. No. 63568 citing United States v. Lewis (C.A.6, 1964), 338 F.2d 137, 139). "Recantation by a significant witness does not, as a matter of law, entitle the defendant to a new trial. This determination is left to the sound discretion of the trial court." State v. Walker (1995), 101 Ohio App.3d 433, 435,655 N.E.2d 823.
 {¶ 36} We find that the trial court did not abuse its discretion in denying appellant a new trial. First, the trial court found Mr. Wilkes' recantation incredible. It appears that the trial court also found Mr. Turvey's testimony either incredible or unpersuasive in light of the evidence that supports a finding that Mr. Wilkes committed the murder. Such matters of credibility are primarily entrusted to the trial court. State v.Rieke (Aug. 14, 1997), Cuyahoga App. No. 71237, 1997 WL 473095 ("Considerable latitude is entrusted to the trial judge because of his opportunity to judge the impact of the evidence, newly discovered or recanted, and place it in proper perspective. The issue is essentially one of credibility and that is entrusted to the trial judge.")
 {¶ 37} Further, we agree with the trial court that there is also significant evidence to support a conclusion that Mr. Wilkes committed the crime. Mr. Wilkes not only told to the police, and subsequently to the jury, the details of his offense but took police to where they could recover a knife which was consistent with the knife used to kill the victim. The knife was identical to a knife purchased at the K Mart at Carnation Mall on March 31, 1999, at 8:10 P.M. Around that same time, Mr. Wilkes was seen at the Carnation Mall by Ms. Mohr and Mr. Campbell. Mr. Wilkes proceeded to show these two people a knife, which was consistent with the knife sold at K Mart and consistent with the knife recovered through Mr. Wilkes. The knife had a substance on it that gave a preliminary positive test result for blood although the substance could not be further identified as human blood. According to Mr. Campbell, Mr. Wilkes told these people that he was in Alliance to handle some business. When asked what business, Mr. Wilkes showed them the knife. Tr. of Trial, Vol. VI, pg. 1487. According to Rose Mohr, Mr. Wilkes showed them the knife and said "that he was there to kill some girl in Alliance, that some guy had paid him." Tr. of Trial, Vol. IV, pg. 1113.
 {¶ 38} Mr. Wilkes was wearing a nylon workout suit at the Mall. After confessing, Mr. Wilkes told the police where to find the pants he wore that night. Nylon pants like the ones he claimed he wore and as seen by Ms. Rohr and Mr. Campbell were found where Mr. Wilkes said the pants would be found.
 {¶ 39} As to the issues concerning the business card, Mr. Robertson testified that the handwriting on the business card was not written by the same person that wrote the sample. However, there are questions as to who actually wrote the sample. Mr. Robertson did not witness the writing of the sample but merely received the sample from a woman named Sue Gless. Sue Gless did not testify at the hearing.
 {¶ 40} Thus upon review and consideration, we find that the trial court did not abuse its discretion.
 {¶ 41} Appellant's second assignment of error is overruled.
 III {¶ 42} In the third assignment of error, appellant asserts that the trial court should have granted appellant post-conviction relief due to trial counsel's alleged failure to provide adequate representation. We disagree.
 {¶ 43} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 44} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 45} In order to warrant a reversal, appellant must additionally show he was prejudiced by counsel's ineffectiveness. "Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of the trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel." State v. Carter
(1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965, (citing Lockhartv. Fretwell (1993), 506 U.S. 364, 370, 113 S.Ct. 838,122 L.Ed.2d 180).
 {¶ 46} Further, both the United States Supreme Court and the Ohio Supreme Court have held that a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Bradley at 143, 538 N.E.2d 373
(quoting Strickland at 697).
 {¶ 47} Here, however, we find that we do not reach the merits of several of appellant's arguments. When a defendant, represented by new counsel on direct appeal, fails to raise therein the issue of competent trial counsel, and that issue could fairly have been determined without resort to evidence outside the record, res judicata is a proper basis for rejecting a post-conviction claim. State v. Cole (1982),2 Ohio St.3d 112, 443 N.E.2d 169, at syllabus. Stated in other words, "Under the doctrine of res judicata, a final judgment of conviction bars the convicted from raising or litigating in any proceedings, except an appeal from that judgment, any defense or claimed lack of due process that was raised or could have been raised . . . on an appeal from that judgment." State v. Perry (May 3, 1967),10 Ohio St.2d 175, 180, 226 N.E.2d 104.
 {¶ 48} A review of the issues raised by appellant demonstrates that the following issues could have been raised on direct appeal and, therefore cannot be raised now:
 {¶ 49} (d) During its case in chief, the Prosecutor introduced photos of the victim with three of her children. (citing the trial transcript at page 789) Appellant asserts that counsel for appellant should have lodged an objection.
 {¶ 50} (e) Counsel allegedly failed to review reports, which are part of the record, prior to the witnesses' testimony. (citing the trial transcript at page 980)
 {¶ 51} (f) Counsel allegedly failed to object to the State's alleged improper introduction of character evidence, specifically, but not limited to references to "shoot fighting." Appellant contends that this evidence was clearly introduced to establish that appellant was a bad person. (citing the trial transcript at page [sic])
 {¶ 52} (g) Counsel purportedly failed to object to speculative testimony. (citing trial transcript at page 1375). Appellant provides the following argument: "Time of death was critical to the State's case. During its case in chief the State introduced evidence from the Appellant's co-workers as to when he left his place of employment. The witness testified that: `[we] figured it was about an hour to an hour and a half that he [appellant] was gone.' Counsel's failure to object left this assertion before the jury and supported the State's case that the Appellant had the time and opportunity to perform the actions that Joe Wilkes testified that he had done."
 {¶ 53} (h) Counsel allegedly compounded an error which allowed a hearsay statement of the store clerk at Dick's Sporting Goods to be considered as expert testimony. (citing the trial transcript at page 1450) During the State's case, the investigating officers testified that they took a photo to a store clerk at Dick's Sporting Goods and that the Clerk identified the print as coming from a Nike Shoe. According to appellant, this was utilized to buttress the testimony of Wilkes who claimed that he had worn Nike sneakers. Although not expressly stated by appellant, this court presumes that appellant contends that trial counsel should have objected to this testimony.
 {¶ 54} (i) Counsel allegedly failed to object to inadmissible hearsay. During the State's case, the Court acted sua sponte to prevent a witness from introducing hearsay evidence. (citing the trial transcript at page 1491) Appellant asserts that counsel should have made an objection, but did not.
 {¶ 55} (j) Counsel allegedly failed to object to numerous instances of prosecutorial misconduct. The vast majority of these instances were without objection.
 {¶ 56} (k) Appellant contends that counsel should have objected when, during closing arguments, the Prosecutor stated as follows: "May 11, 1999, the Defendant comes for printing. . . . When he comes in, he says nothing. . . . . (citing the trial transcript at page 1704)
 {¶ 57} (l) Counsel for appellant allegedly failed to object to the State's vouching for the veracity of its own witness. (citing, e.g. trial transcript at pages 1722 and 1728).
 {¶ 58} Appellant presents the following allegations which are not barred as res judicata:
 {¶ 59} (a) Counsel allegedly arrived at court several mornings during appellant's trial with the strong smell of alcohol on his breath and on the day that the State's primary witness testified he allegedly arrived smelling strongly of alcohol with the same clothes that he wore the day before which looked like he had slept in them.
 {¶ 60} (b) Counsel allegedly failed to obtain expert testimony on blood splatter and other forensic evidence that would have brought into question whether Ms. Layne's murder occurred as represented by the State. Appellant asserts that counsel had a duty to try to undermine the testimony of Mr. Wilkes. Appellant alleges that counsel failed in that obligation in not obtaining the testimony of an expert. As a result, appellant alleges that his defense was prejudiced because a great chance to impeach the testimony of Joseph Wilkes was missed.
 {¶ 61} (c) Counsel allegedly made an ill-advised and belated request for forensic testing of the blood found at the crime scene. Counsel made a request for said testing on December 27, 1999, approximately 29 days before the trial, which the trial court denied.
 {¶ 62} (m) While the State presented eighteen witnesses, the defense only called three witnesses, two of which were originally called by the State. Counsel presented a limited defense, even though several other defense witnesses with important rebuttal information had been subpoenaed and were eager to testify on behalf of Appellant. Appellant attached affidavits to his post-conviction petitions in support of his argument.
 {¶ 63} In addition, appellant contends that even if any of the alleged errors or omissions when viewed individually do not rise to the level of ineffective assistance of counsel, when the errors are considered in total, there was a prejudicial, cumulative effect.
 {¶ 64} As to appellant's allegation in paragraph a, we find no showing of prejudice. Although appellant alleges that one of appellant's two attorneys had the smell of alcohol about him and, on one day, arrived in rumpled clothes, appellant has not shown prejudice. There is no assertion that counsel's behavior was that of one under the influence of alcohol and appellant had another attorney acting as counsel as well. Accordingly, we find no showing of prejudice.
 {¶ 65} As to the allegations in paragraph b, concerning forensic evidence, debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if a better strategy had been available. See Statev. Phillips (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643. A trial counsel's decision not to seek expert testimony "is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant." State v.Glover, Clermont App. No. CA2001-12-102, 2002-Ohio-6392, 2002 WL 31647905, at ¶ 95. "Further, even if the wisdom of such an approach is debatable, `debatable trial tactics' do not constitute ineffective assistance of counsel." Id. (quotingState v. Clayton (1980), 62 Ohio St.2d 45, 49,402 N.E.2d 1189). Further, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. State v. Hartman (2001), 93 Ohio St.3d 274, 299, 754
N.E.2s 1150.
 {¶ 66} In this case, appellant's trial counsel's trial strategy centered around an attempt to identify Mr. Wilkes as the ruthless killer and show how Mr. Wilkes was inconsistent and lied to implicate appellant. Counsel attacked the weakness of the evidence linking appellant to Mr. Wilkes. A decision to obtain a blood splatter expert would have required the trial strategy to evolve into a defense of Mr. Wilkes. However, Wilkes had already entered a plea in which he confessed to the murder. Upon consideration, we find that the decision whether to obtain a blood splatter expert was a question of trial strategy. Accordingly, we must reject appellant's claim of ineffective assistance of trial counsel on this basis.
 {¶ 67} In paragraph c, appellant alleges that trial counsel was ineffective when they failed to motion for forensic tests on blood evidence until it was too late. In the motion for such testing, appellant sought blood and serological testing of certain pieces of evidence, including knives, bedding, blood stains, and clothes. In addition, appellant sought a blood sample from Wilkes to compare to the aforementioned evidence.
 {¶ 68} Appellant has again failed to show prejudice from counsel's actions. The prime means to show prejudice would be to provide such test results in the postconviction relief petition. No such test results were provided. In fact, appellant has failed to show any prejudice.
 {¶ 69} In paragraph m, appellant essentially asserts that counsel were ineffective when they presented a limited defense, including a failure to call several witnesses who had been subpoenaed. The decision whether to call a witness is generally a matter of trial strategy. State v. Williams (1991),74 Ohio App.3d 686, 694, 600 N.E.2d 298.
 {¶ 70} In this case, appellant has provided affidavits from the subpoenaed witnesses, as well as affidavits from potential witnesses who were not subpoenaed. The affidavits of the subpoenaed witnesses fail to state to what those witnesses would have testified. Thus, even if this court would consider trial counsel's decision as something other than a trial strategy, appellant failed to show any prejudice from counsel's failure to call these witnesses.
 {¶ 71} Further, a review of the affidavits by potential witnesses who were not subpoenaed reveals that, in general, each would have testified that appellant and his grandparents told many people, not just Wilkes, as was suggested by the evidence presented at trial, not to call appellant at his home because the phone was tapped. The contention in the affidavits was that this evidence would have countered the State's implication that appellant went out of the way to tell Wilkes not to call appellant at appellant's home because appellant was concerned that Wilkes would make damaging statements concerning the death of Ms. Layne.
 {¶ 72} However, once again, even if this court would consider trial counsel's decision as something other than a trial strategy, we see no prejudice to appellant. In light of the other evidence presented in the case, counsel's failure to call these witnesses does not render the result of the trial unreliable or the proceedings fundamentally unfair. As such, we find no basis for reversal.
 {¶ 73} Last, appellant argues that there was a cumulative effect by all of the alleged instances of ineffective assistance of counsel. In that we have found no basis for a claim of ineffective assistance of counsel upon review of each of appellant's assertions, there can be no cumulative effect.
 {¶ 74} Accordingly, appellant's third assignment of error is overruled.
 IV {¶ 75} In the fourth assignment of error, appellant argues that the trial court should have granted appellant a new trial based upon prosecutorial misconduct. We find that appellant cannot raise this issue in a petition for post-conviction relief. Appellant's arguments are based upon the record of the proceedings in the trial court. As stated previously, an appellant cannot raise an issue in a post-conviction petition that could have been raised on direct appeal. State v. Perry,
supra. This issue and all of the underlying arguments could have been raised on direct appeal.
 {¶ 76} Accordingly, appellant's fourth assignment of error is overruled.
 {¶ 77} The judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J. Hoffman, P.J. and Boggins, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] State v. Thorne, Stark App. No. 2000-CA-00067, 2000 WL 1732540, appeal dismissed (2001), 91 Ohio St.3d 1472,744 N.E.2d 193.
[2] Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194,739 N.E.2d 749.
[3] Specifically, Mr. Hale stated the following "I seen someone came out with a trash bag." Tr. of PCR Hearing, Pg. 23. Further questioning by appellant's counsel elicited that the "someone" was male and Mr. Hale had seen this person coming out of the house. Id. at 23-24.
[4] In the narrative supplement, the officer wrote that Hale stated "he saw a w/m about 5'9", about 180 pounds, in his mid to late 20's, wearing blue jeans and a short sleeve shirt, with medium length hair, exit the residence carrying a garbage bag." Narrative Supplement, dated 7-19-99.