DECISION. *Page 2 
{¶ 1} Defendant-appellant Sherdell Dudley was indicted on one count of aggravated murder with a firearm specification. Following the denial of Dudley's motion to suppress, the case proceeded to a trial where a jury found Dudley guilty of the lesser-included offense of murder with a firearm specification. Dudley's motion for a new trial was denied, and the trial court imposed an aggregate sentence of 18 years' to life imprisonment.
 {¶ 2} Dudley now appeals. In five assignments of error, he argues (1) that the trial court erred in overruling his motion to suppress; (2) that the jury's verdict was against the manifest weight of the evidence; (3) that he received ineffective assistance of counsel; and (4) that the trial court erred in overruling his motion for a new trial and/or acquittal.
 {¶ 3} For the following reasons, the judgment of the trial court is affirmed.
 Factual Background {¶ 4} Dudley was found guilty of the murder of Lamar Robinson. The evidence presented at trial demonstrated that, on January 17, 2006, Dudley had been drinking at Jellies, a neighborhood bar. Dudley encountered Bobby Ball at Jellies, and Ball expressed his desire to buy crack cocaine from Dudley. The two left the bar. Dudley followed Ball to the parking lot outside Lamar Robinson's apartment because Ball needed to get money from Robinson to purchase the drugs. But instead of buying crack cocaine, Ball robbed Dudley of his gun and of the drugs.
 {¶ 5} Dudley returned to Jellies bar. He attempted to call Robinson, with the hope that Robinson could put him in contact with Ball. But Robinson would not *Page 3 
answer his phone. Dudley then called Robinson's aunt, Valerie McCurdy. He asked McCurdy to call Robinson and to connect Dudley to the conversation with a three-way calling feature on McCurdy's phone. Robinson did not answer his phone, but Dudley left a message for him, stating that he needed Robinson to help him find Ball.
 {¶ 6} Dudley left Jellies with Craig Williams, also known as "C-Hustle." The two met Willie Wheeler, also known as "Ill Will," in the parking lot of the Hidden Meadows apartment complex. Williams got into the front passenger seat of Wheeler's car, while Dudley sat in the rear passenger seat of the vehicle. They drove to Ashley Woods, a nearby apartment complex. Over the telephone, Dudley directed someone to come outside. Robinson came out and got in Wheeler's car, sitting in the back of the car behind the driver's seat, next to Dudley.
 {¶ 7} While Wheeler was driving, Dudley repeatedly shot Robinson in the head. Williams looked over his shoulder and saw Robinson bleeding from the head with a flame coming from his right side, where Dudley was seated. Dudley shoved Robinson's body out of the car, onto a side street. He instructed Wheeler and Williams to take what had just happened with them to their graves. Wheeler drove back to Hidden Meadows. Dudley and Williams exited from the car, and Wheeler left it parked next to Dudley's vehicle in the lot.
 {¶ 8} Robinson's body was found on Carlos Road at approximately 11:25 p.m. by a neighbor driving home from work. Dr. Michael Kenny, a senior forensic pathologist with the Hamilton County Coroner's office, conducted an autopsy on Robinson. Dr. Kenny testified that Robinson had received three bullet wounds to the face, and that each bullet wound was fatal. Stippling, a gunpowder residue deposited on the skin, was present around two of the bullet entrance wounds, indicating that Robinson had been shot from a distance of less than two feet away. *Page 4 
 {¶ 9} John Mulholland, a crime-scene investigator with the sheriff's office, located both Wheeler's and Dudley's automobiles in the Hidden Meadows parking lot. After obtaining a search warrant and towing the vehicles to headquarters, Mulholland examined Wheeler's car. He testified that the odor of bleach was pronounced when he opened the car doors. There was also a tremendous amount of blood in Wheeler's car, located primarily behind the driver's seat. Blood spatter was found between the front seats and on the dashboard. A .380-caliber shell casing was found in the back of the car between the door and seat.
 {¶ 10} Mulholland further testified that he had searched several dumpsters in the Hidden Meadows parking lot. Inside one dumpster, he had found a black trash bag containing numerous articles of clothing, including a silk-screen T-shirt, work boots, blue jeans, a dark long-sleeved shirt, socks, a winter coat, and a white hat. The T-shirt, long-sleeved shirt, and jeans were stained with blood.
 {¶ 11} Joan Dawson Burke, a serologist and DNA analyst with the Hamilton County Coroner's office, extracted DNA from the blood stains on the jeans and T-shirt found in the dumpster, as well as from a blood stain on a piece of fabric removed from the back seat of Wheeler's automobile. She compared the extracted DNA to a known sample of Robinson's DNA and determined that all the blood tested matched Robinson's DNA profile.
 {¶ 12} On January 18, 2006, the morning after Robinson's murder, Wheeler told his cousin Leroy Brazille, a sergeant for the Cincinnati Police Department, what had happened. Sergeant Brazille directed Wheeler to contact the police. Wheeler went to the Springfield Township police station and reported Robinson's murder. Springfield Township police then contacted the Hamilton County Sheriffs Department, which had begun to investigate Robinson's murder. *Page 5 
 {¶ 13} Sheriffs detectives attempted to locate both Dudley and Williams. Dudley received word that the detectives wanted to speak to him, and he contacted his attorney, Kevin Bobo. Bobo called Detective Brian Pitchford and set up a meeting for the following day.
 {¶ 14} On January 19, 2006, Bobo met Dudley at his office and transported Dudley to the sheriff's department. Detectives Brian Pitchford and Patrick Dilbert interviewed Dudley about the events leading up to Robinson's murder. Dudley was read his Miranda rights, and Bobo was present for the entire interview. Dudley changed his story several times but eventually confessed that he had murdered Robinson. Detectives Pitchford and Dilbert showed Dudley photographs of the clothing that had been found in the dumpster, and Dudley identified the long-sleeved shirt, boots, jeans, and T-shirt as his own. Dudley stated that he had only wanted to fight Robinson to draw Bobby Ball out, but that Wheeler had handed him a gun and he had proceeded to shoot Robinson.
 Motion to Suppress {¶ 15} In his first assignment of error, Dudley argues that the trial court erred in overruling his motion to suppress.
 {¶ 16} An appellate court's review of a motion to suppress involves a mixed question of law and fact.[1] Because the trial court assumes the role of trier of fact and is in the best position to judge the credibility of the witnesses, this court must accept the trial court's findings of fact if they are supported by competent, credible *Page 6 
evidence.[2] We must then evaluate, without deference to the trial court, whether such facts satisfy the applicable legal standard.[3]
 {¶ 17} Dudley had argued in his motion to suppress that his waiver of rights and confession were not voluntary because he had been under the influence of alcohol and muscle-relaxing drugs. "While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances."[4] Factors relevant to a totality-of-the-circumstances analysis include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of physical threat or inducement."[5]
 {¶ 18} When considering whether a defendant has voluntarily waived hisMiranda rights, "evidence of a written waiver form signed by the accused is strong proof that the waiver is valid."[6] Moreover, "[a] suspect's decision to waive his Fifth Amendment privilege is made voluntarily absent evidence that his will was overborne or that his capacity for self-determination was critically impaired because of coercive police conduct."[7] Similarly, coercive police conduct is a necessary predicate to a finding that a confession has been given involuntarily.[8] The state must prove by a preponderance of the evidence that a defendant's confession and waiver of rights were voluntary.[9] *Page 7 
 {¶ 19} During a hearing on Dudley's motion to suppress, the state presented testimony from Detective Pitchford and from Dudley's attorney, Kevin Bobo. Both Pitchford and Bobo indicated that Dudley was not under the influence of alcohol or drugs at the time that he waived hisMiranda rights and gave his confession. Collectively, Bobo and Pitchford testified that Dudley did not behave as if he was under the influence, nor did he smell of alcohol. Bobo testified that he would have rescheduled the interview had he believed that Dudley was under the influence. Dudley was read, and waived, his Fifth Amendments rights, and both he and Bobo signed a form in acknowledgment. Bobo was present for the entire interview, which lasted several hours. Bobo and Dudley were given several opportunities to talk with each other outside the presence of the detectives. Both Bobo and Pitchford testified that Pitchford had asked Dudley if he had been drinking, although Pitchford explained that the question was routine and was asked in most interviews. Dudley was not threatened in any way during the interview.
 {¶ 20} Dudley, in turn, presented testimony from several witnesses indicating that he had been under the influence at the time of his interview. His uncle, Richard Winfrey, and his brother, Marcelious Dudley, testified that he had been drinking prior to his interview. Marcelious Dudley further testified that he had provided his brother with muscle relaxants to help with shoulder pain. Marcelious Dudley stated that his brother's speech was slurred, he reeked of alcohol, and he had to lean on Bobo's car in the parking lot. But he did not tell Bobo that he believed his brother was intoxicated. Dudley testified that he had consumed half a bottle of Grey Goose vodka prior to his interview, and that he had taken muscle relaxants on his way to Bobo's office. Dudley further testified that Detective Pitchford had alluded to the fact that he had been drinking, but that he had denied this. According to Dudley, *Page 8 
Pitchford was very aggressive, and he did not feel that he was free to leave the interview. Dudley stated that he only confessed to the murder because the detectives would not believe the truth.
 {¶ 21} At the close of this testimony, the trial court overruled Dudley's motion to suppress. The trial court clearly believed the testimony of Pitchford and Bobo when it determined that Dudley had not been under the influence. "Matters as to the credibility of witnesses at a suppression hearing are for the trier of fact to decide."[10]
 {¶ 22} We conclude that, considering the totality of the circumstances, the state had proved by a preponderance of the evidence that Dudley's confession and waiver of rights were voluntary. The interview was conducted in the presence of Dudley's attorney, who did not believe that Dudley was under the influence. Dudley was provided with numerous opportunities to consult with his attorney outside the presence of the detectives. Both Dudley and his attorney acknowledged that he had been read his rights. No coercive police conduct was involved. And although the interview lasted several hours, during a portion of this time Dudley was communicating with his attorney outside the presence of the detectives.
 {¶ 23} The trial court did not err in overruling Dudley's motion to suppress. The first assignment of error is overruled.
 Weight of the Evidence {¶ 24} In his second assignment of error, Dudley argues that his conviction was against the manifest weight of the evidence. When reviewing the weight of the evidence, this court sits as a thirteenth juror.[11] We must review the record, weigh the *Page 9 
evidence, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created a manifest miscarriage of justice.[12]
 {¶ 25} The state presented sufficient evidence from which the jury could reasonably have found that Dudley had purposely caused the death of Lamar Robinson.[13] Although the testimony of Willie Wheeler and Craig Williams contained minor inconsistencies, both stated that Dudley had shot Robinson. And the jury heard Detective Pitchford's testimony that Dudley had confessed to the murder, as well as a taped recording of Dudley's confession. The jury was also presented with physical evidence linking Dudley to the crime, namely that Robinson had been shot from a distance of less than two feet away, that Dudley had been seated next to Robinson in the back seat of Wheeler's car, and that Dudley's clothes were spattered with Robinson's blood.
 {¶ 26} Dudley did present the testimony of several witnesses indicating that he had been intoxicated at the time that he confessed to Robinson's murder, espousing his good character, and revealing that Willie Wheeler had shot Robinson. But the jury was entitled to reject Dudley's arguments that his confession was involuntarily given, as well as his theory that Willie Wheeler had shot Robinson. Matters concerning the credibility of the evidence were primarily for the trier of fact to decide, as the trier of fact was present for the trial and able to personally view the demeanor of the witnesses.[14]
 {¶ 27} On this record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. Dudley's conviction for murder was *Page 10 
supported by the manifest weight of the evidence, and the second assignment of error is overruled.
 Ineffective Assistance {¶ 28} In his third and fourth assignments of error, Dudley argues that he received ineffective assistance of counsel. We consider these assignments together.
 {¶ 29} To succeed on a claim of ineffective assistance, a defendant must demonstrate that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance.[15] Counsel will only be considered deficient if his or her performance "fell below an objective standard of reasonableness."[16] A reviewing court must be highly deferential in judging counsel's performance, and it "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[17] Ultimately, a defendant must show that the outcome of the proceedings would have been different but for counsel's deficient performance.[18]
 {¶ 30} Dudley argues that his counsel was ineffective for failing to secure expert testimony in the field of false confessions, which he alleges was necessary to support his argument that his intoxication had resulted in an involuntary confession.[19] He additionally argues that counsel was ineffective for failing to secure an expert in the field of blood spatter and ballistics, and for failing to secure an expert to conduct an independent autopsy. Dudley posits that such expert testimony *Page 11 
would have cast doubt on the state's evidence and bolstered his theory that Willie Wheeler had murdered Robinson.
 {¶ 31} Generally, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel."[20] The decision to utilize or forgo an expert witness is a matter of trial strategy that we will not second-guess.[21] "A trial counsel's decision not to seek expert testimony is `unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.'"[22]
 {¶ 32} Dudley's counsel had been granted permission by the trial court to retain an expert in the field of false confessions. But no report from the expert was produced, and Dudley did not rely on the expert at trial. It is purely speculative as to what testimony an expert in the field of false confessions would have provided.[23] It is quite possible that the testimony was unfavorable to Dudley, and that is why counsel chose not to rely on it at trial. The testimony to be provided by an expert who could conduct an independent autopsy and from an expert in blood spatter and ballistics is also purely speculative. Such testimony might have been helpful to Dudley, or it might have confirmed the testimony of the state's witnesses. Counsel did thoroughly cross-examine the state's witnesses on these topics.
 {¶ 33} On this record, we cannot say that Dudley's counsel was deficient or that the outcome of the trial would have been different had counsel retained the various experts that Dudley has identified. Dudley did not receive ineffective assistance of counsel, and his third and fourth assignments of error are overruled. *Page 12 
 Motion for a New Trial {¶ 34} In his fifth assignment of error, Dudley argues that the trial court erred in overruling his motion for a new trial and/or acquittal. Dudley does not raise any new arguments under this assignment, but rather argues that the cumulative effect of the arguments in his preceding assignments of error warrants a new trial and/or a judgment of acquittal.
 {¶ 35} But we have already determined that Dudley's arguments concerning the denial of his motion to suppress, the weight of the evidence, and the effectiveness of his counsel are without merit. Consequently, we cannot conclude that the trial court abused its discretion in overruling Dudley's motion for a new trial.[24]
 {¶ 36} Dudley's fifth assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
SUNDERMANN, P.J., and CUNNINGHAM, J., concur.
[1] State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372,797 N.E.2d 71, ¶ 8.
[2] Id.
[3] Id.
[4] State v. Clark (1988), 38 Ohio St.3d 252, 261,527 N.E.2d 844.
[5] State v. Slaughter (Apr. 28, 2000), 1st Dist. No. C-980702.
[6] Id.
[7] Id.
[8] Id.
[9] Id.
[10] Id.
[11] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[12] Id.
[13] See R.C. 2903.02(A).
[14] See State v. Haynes, 1st Dist. No. C-020685, 2004-Ohio-762, ¶ 15.
[15] Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[16] Id. at 688.
[17] Id. at 689.
[18] Id. at 694.
[19] We note that Kevin Bobo, who represented Dudley at the time that he confessed to Robinson's murder, was not Dudley's counsel at trial.
[20] State v. Nicholas (1993), 66 Ohio St.3d 431, 436,613 N.E.2d 225.
[21] See State v. Keeling, 1st Dist. No. C-010610, 2002-Ohio-3299, ¶ 8.
[22] State v. Thorne, 5th Dist. No. 2003CA00388, 2004-Ohio-7055, ¶ 65, quoting State v. Glover, 12th Dist. No. CA2001-12-102, 2002-Ohio-6392, ¶ 95.
[23] State v. Keeling, supra, at ¶ 9.
[24] See State v. Allen (Feb. 18, 2000), 1st Dist. No. C-990310. See, also, State v. Elliott, 1st Dist. No. C-020736, 2003-Ohio-4962, ¶ 10. *Page 1